## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Special Agent Gina Galantino, being sworn, state:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since 2020. I am currently assigned to the Boston Field Office. I am a graduate of the Federal Law Enforcement Training Center, where I completed ATF Special Agent Basic Training and the Criminal Investigator Training Program. During the course of my law enforcement career, I have participated in the execution of state and federal search and/or arrest warrants for violations of firearms and controlled substance laws.

2.      As a Special Agent for ATF, some of my duties include conducting criminal investigations into cases of illegal possession/transfer of firearms, firearms trafficking, firearms manufacturing and violent crimes involving firearms and narcotics trafficking. Through my training, knowledge, and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the use and trafficking of illegal firearms. I have been the affiant on affidavits in support of federal search warrants and arrest warrants. I have participated in and performed surveillance and made arrests of firearm and narcotics traffickers who utilize their electronic devices to further their illegal activity. During the course of my professional experience, I have interviewed numerous defendants, witnesses, victims, confidential informants, and other police officers regarding the illegal trafficking of firearms.

3.      During my tenure with ATF, I have written and/or participated in the execution of federal search warrants, and have debriefed defendants, informants, and witnesses with personal knowledge regarding firearms and narcotics trafficking and the operation of firearms and/or narcotics traffickers. I have also received training through my position as an ATF Special Agent involving firearms and narcotics trafficking. Among other things, this has familiarized me

1

with: (1) the manner in which illegal guns are brought into this state and sold; (2) firearm and narcotics traffickers' methods of operation, including their acquisition, storage, and transportation of both illegal guns and drugs; and, (3) the widespread utilization of cellular telephones in the course of such activities.

4.      Based on my training and experience, and that of other more senior law enforcement officers, I am familiar with federal firearm laws. I know that it is a violation of Title 26 U.S.C. § 5861(a), for any person to engage in the business as a manufacturer or importer of, or dealer in, firearms without having paid the special occupational tax required by § 5801 for his business or having registered as required by § 5802; and it is a violation of Title 18 U.S.C. § 922(o) for any person to transfer or possess a machinegun.

## PURPOSE OF AFFIDAVIT

5.      I submit this affidavit in support of an application for a criminal complaint charging Alec STELLA ("STELLA"), also known as "Dura," DOB: xx/xx/1997, with engaging in the business as a manufacturer or importer of, or dealer in, firearms without having paid the special occupational tax or having registered as required, in violation of 26 U.S.C. § 5861(a); and transferring or possessing a machinegun, in violation of 18 U.S.C. § 922(o).

6.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the criminal complaint and does not set forth each and every fact known to me and other law enforcement officers involved in this investigation.

## PROBABLE CAUSE

### I.  Background of Investigation

7.      In the last several months, ATF has made controlled purchases of machinegun

2

conversion devices ("MCD"s, commonly known as "switches," or "Glock chips") and "ghost guns"[1]

from STELLA using a cooperating defendant ("CD-1")[2].

8.      I have learned during the course of this investigation that STELLA is not a licensed

importer, licensed manufacturer, or licensed dealer of firearms. Further, a query of the Massachusetts

Criminal History Records Bureau – Massachusetts License to Carry ("LTC") / Firearms identification

Card ("FID") records revealed that STELLA was issued an LTC on September 18, 2020 by the Milton

Police Department, however his LTC was suspended on April 21, 2022.[3]

9.      For each of the controlled purchases described below, law enforcement followed the

following procedures: law enforcement officers first searched CD-1's vehicle for money and

contraband, with negative results. Agents then provided CD-1 with government funds and a recording

device for use in the purchase. Investigators then directed CD-1 to make a controlled purchase of

---

[1] Based on my training and experience, I am aware that a "ghost gun," also referred to as a privately made firearm ("PMF"), is a firearm, including a frame or receiver, assembled or otherwise produced by a person other than a licensed manufacturer. PMFs or "ghost guns" do not have serial numbers or other markings placed by a licensed manufacturer at production. Ghost guns are typically assembled from parts purchased separately or obtained through kits sold online.

[2]

[3] I have obtained and reviewed a letter from the Milton Police Department informing STELLA that his license was suspended.  That letter references a Canton Police Department report dated April 21, 2022.  I have obtained and reviewed that report.  According to the report, Canton PD was called to STELLA's workplace following an altercation between STELLA and another employee.  The other employee showed law enforcement a video recording of STELLA assembling "ghost guns."  Ghost guns are unserialized and untraceable firearms that can be purchased unassembled online for assembly at home. According to the report, law enforcement searched STELLA's vehicle and recovered fentanyl, cocaine, 4 firearms, and multiple rounds of ammunition.  All charges associated with that incident have been dismissed.

machinegun conversion devices, as well as additional firearms, and conducted surveillance while CD-1 drove to a prearranged location to meet STELLA, throughout the transaction, and as CD-1 drove back to a prearranged meet location to meet with investigators. There, agents retrieved the machinegun conversion devices, any additional firearms or evidence, the recording, and again searched CD-1's vehicle for contraband and money, with negative results.

## II. Controlled Purchases from STELLA

### ███ Controlled Purchase

10.    In or around ███ 2025, CD-1 made contact with STELLA on a phone with the number xxx-xxx-9472 ("STELLA PHONE") through both phone call and text message.  During those conversations, STELLA agreed to sell machinegun conversion devices and a privately made pistol to CD-1.

11.    STELLA and CD-1 arranged to meet at STELLA's residence.  Prior to the transaction, investigators met with CD-1 at a prearranged location where they searched CD-1 and their vehicle for contraband and excess money, with negative results.  CD-1 was equipped with a recording device and provided with $2,500 in government funds.

12.    Investigators then followed CD-1 to the residence and observed CD-1 enter with STELLA.  Following the sale, investigators met with CD-1 at a prearranged location, where they recovered six MCDs and a privately made firearm from CD-1.

13.    Based on conversations with CD-1 and a review of the audio/video recording of the transaction,[4] investigators learned the following.  STELLA sold CD-1 six (6) MCDs and one (1) privately made firearm for approximately $2,500. During this transaction, STELLA escorted CD-1

---

[4] Law enforcement officers involved in this investigation and CD-1 have become familiar with STELLA's voice and have recognized it on phone calls on the STELLA PHONE. Furthermore, investigators, including myself, are familiar with STELLA's appearance based on surveillance during the investigation and his Registry of Motor Vehicles ("RMV") photo.

inside the residence to the third floor, where STELLA and CD-1 completed the transaction and engaged in conversation. As relevant to this investigation, STELLA explained to CD-1 the difference between a 3D-printed switch and a metal switch. STELLA further explained that the high cost of the switches was due to the severity of the penalty for being caught with one, stating "You put this [the switch] in … it makes it [a gun] automatic. If it goes brrrt and the policia catch you with this you go to jail … the time is 25 years."

███ **Controlled Purchase**

14.     In or around ███ 2025, CD-1 contacted STELLA via the STELLA PHONE to negotiate an additional purchase. STELLA agreed to sell additional MCDs to CD-1 and they arranged to meet at STELLA's residence.

15.     Investigators met with CD-1 at a prearranged location where they searched CD-1 and their vehicle for contraband and excess money, with negative results. CD-1 was equipped with a recording device and provided with $2,000 in government funds.

16.      Investigators then followed CD-1 to the residence, where they observed STELLA exit the side door and then escort CD-1 inside.

17.     Based on conversations with CD-1 and a review of the audio/video recording, STELLA took CD-1 into the kitchen area of the residence. There, STELLA handed CD-1 a plastic bag containing ten (10) 3D printed MCDs. CD-1 then handed STELLA $2,000 in government funds.

18.     Investigators observed STELLA escort CD-1 outside of the residence. Following the transaction, investigators met with CD-1 at a prearranged location, where they recovered ten MCDs from CD-1.

███ **Controlled Purchase**

19.     In or around ███ 2025, CD-1 contacted STELLA via the STELLA PHONE to negotiate an additional purchase. STELLA agreed to sell additional MCDs to CD-1 and they arranged

to meet at STELLA's residence.

20.     Investigators met CD-1 at a prearranged location where they searched CD-1 and their vehicle for contraband and excess money, with negative results.  CD-1 was equipped with a recording device and provided with $4,500 in government funds.

21.     Investigators then followed CD-1 to the residence.  Based on conversations with CD-1 and review of the audio/video recording, when CD-1 arrived at the residence, STELLA instructed CD-1 to enter through the side door and proceed to the third floor.

22.     During the transaction, STELLA was observed assembling multiple 3D printed MCDs and a privately made firearm.  CD-1 also observed a 3D printer in the room.





23. CD-1 provided STELLA with $4,500 in government funds. In exchange, STELLA handed CD-1 ten (10) MCDs and one (1) privately made firearm. Investigators observed CD-1 exit the residence.

24. Following the transaction, investigators met with CD-1 at a prearranged location, where they recovered ten MCDs and one privately made firearm from CD-1.

25. In total, from June 2025 through August 2025, CD-1 purchased 26 MCDs and two privately made firearms from STELLA in exchange for $9,000.

### III.   Execution of Search Warrants

26. On September 18, 2025, I obtained federal warrants to search the Dorchester, MA residence of STELLA, as well as STELLA's person, for evidence, fruits, and instrumentalities of violations of 26 U.S.C. § 5861(a), 18 U.S.C. § 922(o), and 18 U.S.C. § 933(a).

27. On September 19, 2025, at approximately 6:00 a.m., the ATF Boston Violent Crime Joint Strike Force executed the federal search warrants at STELLA's residence. During the execution of the search warrant, law enforcement encountered STELLA and his mother, who also resides at the residence. STELLA declined to speak with investigators.

28. During the search, investigators discovered six (6) different 3D printers in the third-floor room of the home where STELLA appears to conduct his manufacturing activities, as well as a substantial amount of materials used to make firearms and MCDs, including a Dremel drill, numerous firearm parts and accessories, including extended magazines, and numerous pieces used to manufacture MCDs. Investigators also found one completed MCD.

29. Additionally, investigators found a total of thirteen (13) firearms, as defined by 18 U.S.C. § 921(a)(3), including two privately made firearms, a Sig Sauer Pistol, seven pistol frames, and three rifle receivers. Investigators also found over 100 rounds of ammunition and multiple spent shell casings.

30.     In addition to the 3D printers and parts used to manufacture firearms and MCDs, investigators found other items indicating that STELLA is in the business of manufacturing and selling firearms, including over $2500 cash and a ledger book.  A page from the ledger book is pictured below, showing a calculation for "take home" profit and a note stating "Gotta find other addresses to send, buy MUP-1 or other gun parts, shop around for cheapest buy."



## CONCLUSION

31.     Based on the foregoing, there is probable cause to believe that on or about various dates beginning no later than June 2025, and up to September 2025, in Boston, in the District of Massachusetts, STELLA did engage in the business as a manufacturer or importer of, or dealer in, firearms without having paid the special occupational tax or having registered as required, in violation of 26 U.S.C. § 5861(a); and did transfer or possess a machinegun, in violation of 18 U.S.C. § 922(o).

Accordingly, I respectfully request that the Court issue the requested criminal complaint.

_____

Gina Galantino
Special Agent, ATF

SWORN to me telephonically in accordance with Fed. R. Crim. P. 4.1 on this date of September 19, 2025.

_____

HONORABLE JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE